**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. MARK A. BARNETT, JUDGE**
-------------------------------------------------------------------- X
**IMPERIA TRADING, INC.,**                           :
                                                     :
        **Plaintiff,**                    :
                                                     :
        *v.*                             :      **No. 15-cv-00142**
                                                     :
**THE UNITED STATES,**                               :
                                                     :
        **Defendant.**                    :
-------------------------------------------------------------------- X

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

NEVILLE PETERSON LLP
John M. Peterson
Patrick B. Klein
55 Broadway, Ste. 2602
New York, NY 10004
(212) 635-2730
jpeterson@npwny.com

Counsel to Plaintiff,
Imperia Trading Inc.

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ ii

TABLE OF AUTHORITIES ....................................................................................... iii

I.    STATEMENT OF FACTS ............................................................................... 1

   A.   The Transactions at Bar ............................................................................ 1

   B.   Protest Proceedings Before CBP ............................................................. 3

II.    STANDARD OF REVIEW ............................................................................. 4

III.   ANALYSIS ..................................................................................................... 6

   A.   The Goods Are Properly Appraised on the Basis of Transaction Value ............................. 6

   B.   Identifying the Appropriate "Sale for Exportation to the United States" ............................ 8

   C.   There Is A Bona Fide Sale From The Factories To Team Energy ..................................... 9

   D.   The Bona Fide Sales Are "For Exportation To The United States" .................................. 13

   E.   There is No Evidence of "Non-Market Influences" Which Would Make the "First Sale" Prices Unacceptable as the Basis of Transaction Value ........................................................ 14

IV.   CONCLUSION .............................................................................................. 21

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Torpharm Inc.*, 300 F.3d 1367 (Fed. Cir. 2007). ................................... 9

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). ..................................................... 8

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). ................................................. 8

*E.C. McAfee Co. v. United States,* 842 F.2d 314 (Fed. Cir. 1988). ............................... 11

*F. B. Vandergrift & Co. v. United States*, 56 C.C.P.A. 105 (1969). ............................... 21

*Frolow v. Wilson Sporting Goods Co.*, 710 F.3d 1303 (Fed. Cir. 2013). ......................... 8

*Generra Sportswear Inc. v. United States*, 905 F.2d 377 (Fed. Cir. 1990). ................... 11

*J. L. Wood v. United States*, 62 CCPA 25 (1974) .................................................. 11, 14

*La Perla Fashions Inc. v. United States,* 22 C.I.T. 393 (1998). .................................... 23

*Meyer Corporation, U.S. v. United States*, Slip Op. 21-26 (March 1, 2021) ............ 18, 19, 20, 23

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099 (9th Cir. 2000) ................. 7

*Nissho-Iwai American Corp. v. United States*, 982 F. 2d 505 (Fed. Cir. 1992) ............. passim

*Peerless Clothing Int'l v. United States*, 33 C.I.T. 24 (2009) .................................... 23

*Synergy Sport International, Ltd. v. United States,* 17 C.I.T. 18 (1993) ...................... 16

*United States v. Getz Bros. & Co.*, 55 CCPA 11 (1967) .......................................... 12

*VWP of America Inc. v. United States*, 175 F.2d. 1321 (Fed. Cir. 1999) ................ 11, 14

*Wi-LAN United States v. Ericsson Inc.*, 675 Fed. Appx. 984 (Fed. Cir. 2017) ............. 8

**Statutes**

19 U.S.C. 1401a .......................................................................................... passim

26 U.S.C. §1059A ......................................................................................... 19

26 U.S.C. §482 ............................................................................................ 19

**Other Authorities**

*Customs Headquarters Ruling 545254 of November 22, 1994.* ................................. 17

*Customs Headquarters Ruling 545360 of May 31, 1994* .......................................... 15

*Customs Headquarters Ruling 545567 of May 5, 1995* ............................................ 15

*Customs Headquarters Ruling 546657 of January 30, 1998* ..................................... 17

*Customs Headquarters Ruling 546710 of March 2, 1999* ......................................... 17

*Customs Headquarters Ruling 546871 of February 17, 1999* .................................... 17

*Customs Headquarters Ruling H137455 of February 16, 2012* .................................. 16

*Customs Headquarters Ruling H295538 of May 31, 2018* ........................................ 17

*Customs Headquarters Ruling H301049 of March 18, 2019* ................................ 13, 17

*Customs Headquarters Rulings 545474 of August 25, 1995* ..................................... 17

S. Rep. 96-249. 96th Cong., 1st Sess, at 20. .................................................... 10, 18

**Treatises**

Saul Sherman and Hinrich Glashoff,, *Customs Valuation: Commentary on the GATT Customs Valuation Code*, 2d ed., Kluwer Law & Taxation Publishers (2008) ........................... 9, 20, 24

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. MARK A. BARNETT, JUDGE**

-------------------------------------------------------------------- X

IMPERIA TRADING, INC.,              :

                :

       **Plaintiff,**           :

                :

        *v.*                :         **No. 15-cv-00142**

                :

THE UNITED STATES,          :

                :

       **Defendant.**       :

-------------------------------------------------------------------- X

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

In accordance with Rule 56 of the Rules of the United States Court of International Trade ("USCIT R."), plaintiff Imperia Trading, Inc., respectfully moves this Court for an order granting summary judgment in its favor concerning the valuation under 19 U.S.C. §1401a(b) and the *Nissho-Iwai* first sale rule regarding the dutiable value of certain imports of clothing from the People's Republic of China. The Court should grant plaintiff summary judgment and direct CBP to re-liquidate the merchandise under the *Nissho-Iwai* first sale rule.

## I.       STATEMENT OF FACTS

### A.  The Transactions at Bar

Plaintiff Imperia Trading Inc. is an importer and wholesaler of men's wearing apparel and apparel accessories, established in 1987.

As noted herein and in the attached Rule 56.3 Statement, Imperia purchased wearing apparel on a "delivered duty paid" ("DDP") basis from two Hong Kong-based vendors, Team Energy and New Treasure, with the point of delivery being Imperia's warehouse in Port Washington, New York.  Under the DDP Incoterm, the foreign seller is responsible for clearing

the merchandise through Customs, and paying all applicable Customs duties[1]. Unbeknownst to Imperia, however, Team Energy and New Treasure had engaged Imperia's Customhouse broker, Agra-Services, Inc. and, improperly, directed the broker to file the entries in in Imperia's name. [2] Beginning in 2013, United States Customs and Border Protection ("CBP" or "Customs") undertook an audit review of Imperia's entries. Imperia had no information concerning the entries, or the apparently incorrect values which had been declared to Customs.  As a result, Imperia engaged counsel and undertook a review of the entries identified by Customs.

Imperia did not known that it was being named as the importer of record for the goods at bar, because the logistics providers handling the DDP shipments (Wider, the freight forwarder, and Agra-Services, the Customs broker) treated them differently from the way they handled shipments of goods which Imperia purchased on an FOB foreign port of export basis. With respect to the DDP shipments at bar, duties were forwarded to the broker by Wider Services on behalf of Team Energy and New Treasure; Customs duties were not paid out of Imperia's Automated Clearing House ("ACH") account, which would have alerted Imperia to the situation. Moreover, Agra Services Inc. invoiced Wider, the freight forwarder, for its clearance services, and provided Wider with copies of the Customs Form 7501 entry summaries and associated records. Imperia never received copies of these documents.

---

[1] See International Chamber of Commerce (ICC): **DDP - Delivered Duty Paid (named place of destination)** Seller is responsible for delivering the goods to the named place in the country of the buyer, and pays all costs in bringing the goods to the destination including import duties and taxes. The seller is not responsible for unloading. This term is often used in place of the non-Incoterm "Free In Store (FIS)". This term places the maximum obligations on the seller and minimum obligations on the buyer. No risk or responsibility is transferred to the buyer until delivery of the goods at the named place of destination. Available online at: https://www.searates.com/reference/incoterms/ddp/  (last accessed March 14, 2021).

[2] See Affirmation of Raffi Shaya, submitted herewith. This was, in effect, a case of "identity theft". The Customhouse broker billed Team Energy and New Treasure for all Customs duties, brokerage fees and associated charges, and were paid by Team Energy and New Treasure. Imperia had no knowledge that it had been identified as importer of record on the entries which are the subject of this action until CBP requested copies of the entries for audit purposes. Imperia did not have the entries, and had to retrieve them from its broker.

Both Team Energy and New Treasure acknowledged in writing that they were not authorized to enter the DDP goods in the name of Imperia, and that it was an error for them to do so.  [See Exhibit A to Affirmation of Raffi Shaya, submitted herewith]. When Imperia learned of Team Energy and New Treasure's practice, Imperia terminated it and instructed its Customhouse broker not to identify Imperia as importer of record on goods sold by New Treasure and Team Energy.  Imperia also obtained copies of the entries that had been filed in respect of the DDP shipments.

The CBP auditors were unable to confirm the accuracy of the values declared to Customs in the subject entries. The auditors did confirm that Imperia had purchased the goods on "DDP Port Washington, New York" terms, and had paid the DDP prices. Thereafter, Customs appraised the entries in liquidation on the basis of "transaction value", 19 U.S.C. 1401a(b), on the basis of the DDP prices which Imperia paid to the two foreign vendors, adjusted to exclude Customs duties and estimated international transportation charges[3]. Upon liquidation, CBP billed Imperia for additional duties, plus interest.

## B. Protest Proceedings Before CBP

Imperia timely protested the appraisement in liquidation of its entries. In its protest, Imperia sought to have the goods appraised on the basis of "transaction value", 19 U.S.C. §1401a(b), but according to the price paid or payable in the  "first sale" for exportation, in accordance with the rule set out  by the Federal Circuit in *Nissho-Iwai American Corp. v. United States*, 982 F. 2d 505 (Fed. Cir. 1992).  The merchandise involved in the protested entries had been subject to two "sales for exportation to the United States" – (1) a sale by Chinese manufacturers to Hong Kong-based

---

[3] Since Imperia purchased on DDP terms, it did not book the international transportation, and did not have access to bills of lading or freight bills showing the exact amount of international freight charges. Customs used an estimate in determining the liquidated values.

middlemen Team Energy and New Treasure, and (2) the "DDP Port Washington, N.Y." sales from the middlemen to Imperia. With its protest, Imperia submitted documentation substantiating the "first sales" between the Chinese manufacturers and the (unrelated) Hong Kong middlemen, all of which were sales "for exportation to the United States." The documentation was that which CBP specified in *Treasury Decision 96-87* to be supplied by importers seeking to establish "transaction value" on the basis of the "first sale" for exportation to the United States.

Customs *allowed* Imperia's protests with respect to goods purchased from New Treasure, but denied the protest with respect to goods purchased from Team Energy, claiming the lack of proof of payment from Team Energy to the Chinese manufacturers in documenting these transactions.

The missing documents for the Team Energy sales were retrieved, and were produced to Customs [in connection with 19 U.S.C. §1515(d) requests for voidance of the protest denial, which the agency disregarded]. See Exhibit B to Affirmation of Raffi Shaya. These proofs of payment were produced to the defendant in discovery and are incorporated in plaintiff's Rule 56.3 Statement.

As discussed herein, plaintiff Imperia is entitled to have the goods properly appraised on the basis of transaction value, 19 U.S.C. §1401a(b), according to the "first sale" prices at which the goods at bar were sold from  Chinese manufacturers to Team Energy, "for exportation to the United States", see *Nissho-Iwai, supra.*

## II.   <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate where the "movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law" Fed. R. Civ. P. 56(c). To obtain summary judgment, "the moving party must either produce evidence negating

an essential element of the nonmoving party's claim . . . or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party meets its initial burden of production, the non-movant must "produce enough evidence to create a genuine issue of material fact." *Id*. at 1102-03.

"Material" facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a "genuine" dispute of material fact if there is sufficient evidence for a reasonable factfinder to find for the plaintiff in light of the appropriate evidentiary burden. *Id*. at 251-54. A party opposing a motion for summary judgment may not rest upon mere allegations or denials, but must point to specific and sufficient evidence of the claimed differences to require that the facts be established at trial. *Id*. at 248-49. In determining sufficiency, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255. Even where basic facts are undisputed, if reasonable minds could differ as to the inferences to be drawn from those facts, summary judgment should be denied. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

The law in the Federal Circuit is clear: "It is the job of the fact-finder – not the Court at summary judgment – to weigh the evidence and make a decision." *Frolow v. Wilson Sporting Goods Co.*, 710 F.3d 1303 (Fed. Cir. 2013), citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)[4]; see also *Wi-LAN United States v. Ericsson Inc.,* 675 Fed. Appx. 984 (Fed. Cir. 2017). When making a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case, but to determine whether there is a genuine issue for

---

[4] As noted in *Anderson v. Liberty Lobby, supra*, "At the summary judgment stage, the **trial judge's function is not himself to weigh the evidence** and **determine the truth of the matter but to determine whether there is a genuine issue for trial**. There is no such issue unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. 477 U.S. at 242-43.

trial. *See Fifth Third Bank of W. Ohio v. United States*, 55 Fed. Cl. 223 (2003). Even where the government construes a point of law on summary judgment, the existence of material disputed facts requires the matter proceed to trial. *Abbott Labs. v. Torpharm Inc.*, 300 F.3d 1367 (Fed. Cir. 2007).

### III.   ANALYSIS

#### A.   The Goods Are Properly Appraised on the Basis of Transaction Value

Section 402 of the Tariff Act of 1930, as amended, [19 U.S.C. §1401a], sets out the various statutory bases for the appraisement of imported merchandise for purposes of duty assessment. The preferred bases of appraisement, in hierarchical order, are:

(1) The transaction value of the imported merchandise [19 U.S.C. §1401a(b)];
(2) The transaction value of identical or similar merchandise [*Id.*, §1401a(c)];
(3) The deductive value of the merchandise [*Id.*, §1401a(d)];
(4) The computed value of the merchandise [*Id.*, §1401a(e)]; and
(5) A "fallback method" of appraisement using reasonable ways and means [*Id.*, §1401a(f)].

The United States' Customs valuation statute is based on the methods of appraisement set out in the *Agreement on Implementation of Article VII of the General Agreement on Tariffs and Trade (Customs Valuation –1979)*, often referred to as the GATT Customs Valuation Code[5]. It was enacted as Title II of the Trade Agreement Act of 1979, Pub. L. 96-39, 93 Stat. 145 et seq.

As noted in the Senate Report accompanying the Trade Agreements Act:

The amended version of Section 402 would contain five methods – one primary method and four secondary methods – for determining Customs value. The five methods would be arranged in a hierarchical fashion with an order of priority governing the application of each method. The first, or primary, method, i.e., the transaction value of the merchandise, is to be used whenever possible. In cases where it may not be used, the second method is

---

[5] The most comprehensive review of the Code is contained in Saul Sherman and Hinrich Glashoff,, *Customs Valuation: Commentary on the GATT Customs Valuation Code*, 2d ed., Kluwer Law & Taxation Publishers (1988).

to be used. If customs value cannot be found using the second method, the third method is to be used, and so on. The second, third, fourth and fifth methods of valuation are, respectively: the transaction value of identical merchandise; the transaction value of similar merchandise; the deductive value; and the computed value. If a value still cannot be determined, a residual method of valuation would provide for the value to be determined on a basis derived from one of the first five methods, with reasonable adjustments.

S. Rep. 96-249. 96th Cong., 1st Sess, at 20.

An importer may elect, before the filing of an entry summary, to have computed value applied to its transactions before deductive value is applied. See 19 C.F.R. §151.102(c).

The principal basis of appraised value is the transaction value of the imported merchandise, which is defined at 19 U.S.C. §1401a(b) as follows:

**(b)Transaction value of imported merchandise**

(1)The transaction value of imported merchandise is the price actually paid or payable for the merchandise when sold for exportation to the United States, plus amounts equal to—

> (A)the packing costs incurred by the buyer with respect to the imported merchandise;
>
> (B) any selling commission incurred by the buyer with respect to the imported merchandise;
>
> (C) the value, apportioned as appropriate, of any assist;
>
> (D)any royalty or license fee related to the imported merchandise that the buyer is required to pay, directly or indirectly, as a condition of the sale of the imported merchandise for exportation to the United States; and
>
> (E) the proceeds of any subsequent resale, disposal, or use of the imported merchandise that accrue, directly or indirectly, to the seller.
>
>> The price actually paid or payable for imported merchandise shall be increased by the amounts attributable to the items (and no others) described in subparagraphs (A) through (E) only to the extent that each such amount (i) is not otherwise included within the price actually paid or payable; and (ii) is based on sufficient information. If sufficient information is not available, for any reason, with respect to any amount referred to in the preceding sentence, the transaction value of the imported merchandise

concerned shall be treated, for purposes of this section, as one that cannot be determined.

Thus, in order for "transaction value" to be an appropriate basis of appraisement, there must be a *bona fide* sale of merchandise, which is "for export to the United States". For Customs valuation purposes, a "sale" is defined as a transfer of title to goods in exchange for consideration. *J. L. Wood v. United States*, 62 CCPA 25 (1974); see also *VWP of America Inc. v. United States*, 175 F.2d. 1321 (Fed. Cir. 1999). That the goods are being sold "for export to the United States" can be determined by examining the bills of lading, the destinations noted on invoices and other commercial documents, or factors evidencing a United States destination, such as product labeling indicating the United States as a destination. See *Generra Sportswear Inc. v. United States*, 905 F.2d 377, 380 (Fed. Cir. 1990).

**B.   <u>Identifying the Appropriate "Sale for Exportation to the United States"</u>**

Customs and the Courts have recognized that there will be situations where there are two or more sales of the merchandise "for export to the United States" – for example, a sale from a manufacturer to a middleman and a resale by the middleman to a United States importer.  The courts have always recognized that a manufacturer's price may be accepted as the basis for transaction value appraisement if it falls within the parameters of the statute. *E.C. McAfee Co. v. United States,* 842 F.2d 314, 319 (Fed. Cir. 1988).  In *Nissho Iwai American Corp. v. United States*, 982 F.2d 505 (Fed. Cir. 1992), the Court of Appeals recognized that where there are two or more sales of merchandise "for exportation to the United States", the dutiable "transaction value" may

be based on the price in the first such sale which is made at arms' length. [6]   The Court in *Nissho-Iwai* stated:

> The manufacturer's price constitutes a viable transaction value when the goods are clearly destined for export to the United States and when the manufacturer and the middleman deal with each other at arm's length, in the absence of any non-market influences that affect the legitimacy of the sales price.

*Nissho Iwai Am. Corp. v. United States*, 982 F.2d 509 (Fed. Cir. 1992). In so ruling, the Federal Circuit indicated that it was bound by the "first sale" rule enunciated by its predecessor in *United States v. Getz Bros. & Co.*, 55 CCPA 11, 22 (1967). Where a *bona fide* first sale price is established, CBP is bound to accept it, and lacks the authority to select another sale for valuation.[7]

### C.  There Is A Bona Fide Sale From The Factories To Team Energy

---

[6] As Customs itself noted in *Customs Headquarters Ruling 546225 of April 14, 1997*:

> In *Nissho Iwai American Corp. v. United States*, 982 F.2d 505 (Fed. Cir. 1992), the Court reaffirmed the principle of *E.C.McAfee Co. v. United States*, 842 F.2d 314 (Fed. Cir. 1988), that a manufacturer's price, for establishing transaction value, is valid so long as the transaction between the manufacturer and the middleman falls within the statutory provision for valuation.  In reaffirming the McAfee standard the court stated that in a three-tiered distribution system:
>
>> The manufacturer's price constitutes a viable transaction value when the goods are clearly destined for export to the United States and when the manufacturer and the middleman deal with each other at arm's length, in the absence of any non-market influence that affect[s] the legitimacy of the sale price... [T]hat determination can only be made on a case-by-case basis.
>
> *Id.* at 509. See also, *Synergy Sport International, Ltd. v. United States*, 17 C.I.T. 18, Slip Op. 93-5 (CT. Int'l Trade January 12, 1993).

[7] Thus, the Court in *Nissho-Iwai* noted:

> Accepting that both the manufacturer's price and the middleman's price may serve as the basis of transaction value, the critical issue on appeal here centers upon which price is legally proper. In view of the controlling and binding authority of *McAfee*, we hold that the transaction value of the imported passenger cars at issue must be based on the KHI-NIC contract price. See also *Generra Sportswear Co. v. United States*, 905 F.2d 377, 381 n.7 (Fed. Cir. 1990).

*Nissho Iwai Am. Corp. v. United States*, 982 F.2d 510 (Fed. Cir. 1992).

With respect to the question of Customs valuation, the issue between the parties is whether the documentation provided by Team Energy and Imperia is sufficient to establish the "first sale" prices for purposes of Customs valuation.

The parties agree that the goods at bar are subject to appraisement on the basis of transaction value, as defied in 19 U.S.C. §1401a(b). The "transaction value" of imported merchandise is defined as the price actually paid or payable for the merchandise when sold for exportation to the United States, plus certain statutory additions not here relevant. Where goods are the subject of two or more "sales for exportation" to the United States, the transaction value may be determined on the basis of the price in the first such sale which is made at arm's length. *Nissho-Iwai American Corp. v. United States*, 982 F.2d 505 (Fed. Cir. 1992). In the instant case, for each of the protested transactions, there are two sales of the goods "for exportation to the United States"– a sale from various Chinese manufacturers to Team Energy, and a second sale from Team Energy to Imperia.

Team Energy is not related to any of the manufacturers for purposes of the Customs appraisement statute. Customs has ruled that where buyers and sellers are unrelated, there is a presumption that prices set between them are at "arm's length".[8] Team Energy and its Chinese suppliers are not related parties, and prices in "sales for exportation" from the suppliers to Team Energy are made at arm's length. The protested merchandise is properly subject to appraisement on the basis of transaction value, based upon the "first sale" prices at which the Chinese suppliers sold the goods to Team Energy, for export to the United States.

---

[8] See, e.g., *Customs Headquarters Ruling H301049 of March 18, 2019*; *Customs Headquarters Ruling H295538 of May 31, 2018.*

Plaintiff's Exhibits to its Rule 56.3 statement, containing the relevant transaction documents, provide a complete information concerning the "first sale" transactions in question. For each protested entry, Imperia provided, among other documents:

➤ Purchase orders from Imperia to Team Energy;

➤ Invoices from Team Energy;

➤ Purchase orders from Team Energy to the factories;

➤ Invoices from the factories to Team Energy; and

➤ Proof or payment of amounts from Team Energy to the manufacturers.

These documents contain evidence establishing that the sales of the goods from the factories to Team Energy are *bona fide* sales "for exportation to the United States" and thus qualify as the basis for determination of dutiable "transaction value". The documents evidence transfers of title to merchandise in exchange for consideration. The invoices from Team Energy to Imperia reflect that Team Energy had title to the goods and was transferring same to Team Energy, as evidenced by their shipment to, and receipt by, Imperia.

For purposes of the transaction value statute, there must be a bona fide "sale" of the merchandise, which sale is "for the export to the United States". A "sale" is defined, for purposes of the Customs valuation statute, as a transfer of title to goods in exchange for consideration. *J. L. Wood v. United States*, 62 CCPA 25, 33 (1974); see also *VWP of America Inc. v. United States*, 175 F.3d. 1327, 1339 (Fed. Cir. 1999). For each of the transactions in question, Plaintiff has produced evidence, set out in its appended Rule 56.3 statement, which shows the placement of a purchase order by Team Energy to an unrelated factory; a stated price and delivery term; invoices from the factory to Team Energy at the stated price and delivery term; and payment of

consideration from Team Energy to the foreign vendors. These are the elements of proof sufficient to establish the existence of a *bona fide* sale.

The Rule 56.3 statement also shows the purchase orders from Imperia to Team Energy, stating the "DDP" purchase terms; the DDP invoices from Team Energy to Imperia; and the proof that Imperia paid the DDP terms. The documentary requirements for establishing a "first sale" transaction value, set out by Customs in *Customs Service Decision 96-87*, have been satisfied.

The "first sale", to be usable as the basis for "transaction value", must also be one "for export to the United States". Thus, the purchase orders from Team Energy to Lap Shing or Lai Wan factories expressly reference the purchase orders received from Imperia Trading, and indicated that the goods are destined for the "United States of America" and are to be shipped "By Sea". Lap Shing or Lai Wan's invoices to Team Energy also note the Team Energy purchase orders. This indicates that the sales from Lap Shing or Lai Wan factories to Team Energy are sales "for export to the United States".

A demonstrative analysis of the transactions is set forth at Plaintiff's Exhibit O.  Each set of the individual transaction documents are essentially self-explanatory and are best understood through direct review rather than as a narrative. In all cases, purchase orders issued by Team Energy to the foreign factories indicated that the goods were destined for export to the United States. These documents typically reflected Imperia's purchase order numbers for the goods. Hence, the goods were clearly "for export to the United States". The invoices and proofs of payment contained in the Rule 56.3 statement evidence the *bona fides* of the sales, to it, the transfer to title in goods for consideration. As noted above, the parties were not related and presumed to be

dealing at arms' length[9].  The elements of establishing a "first sale" which can be used as the basis of a dutiable transaction value, 19 U.S.C. §1401a(b) are satisfied.

### D.  The Bona Fide Sales Are "For Exportation To The United States"

Customs typically assumes that the price paid by the importer of record represents the price paid or payable for the goods, and thus the basis for dutiable transaction value. See, e.g., *Customs Headquarters Ruling 545567 of May 5, 1995; Customs Headquarters Ruling 545360 of May 31, 1994.* However, the presumption is rebuttable. Thus, in the case of *Nisso-Iwai American Corp. v. United States*, 982 F. 2d 505 (Fed. Cir. 1992) the Court of Appeals for the Federal Circuit held that where goods were the subject of two or more "sales for exportation to the United States", they could be appraised, for transaction value purposes, on the basis of the price in the first "sale for exportation" which was made at an arm's-length basis. *Id.* at 509.  The court further stated that in order for a transaction to be viable under the valuation statute, it must be a sale negotiated at arm's length, free from any non-market influences, and involving goods clearly destined for the United States. See also, *Synergy Sport International, Ltd. v. United States,* 17 C.I.T. 18, 20 (1993); *Customs Headquarters Ruling H137455 of February 16, 2012*[10].

For each vendor, the documents indicate that the goods are sold by the factories on terms indicating that they are clearly destined "for exportation to the United States". Purchase contracts

---

[9] Presented with complete evidence concerning the transactions in which Imperia purchased goods from New Treasure, Customs allowed the instant protests.

[10] Thus, in *Customs Headquarters Ruling H137455 of February 16, 2012*, Customs stated:

> In accordance with the Nissho Iwai decision and our own precedent, we presume that transaction value is based on the price paid by the importer. In further keeping with the court's holding, we note that an importer may request appraisement based on the price paid by the middleman to the foreign manufacturer it situations where the middleman is not the importer. However, it is the importer's responsibility to show that the "first sale" price is acceptable under the standard set forth in Nissho Iwai. That is, the importer must present sufficient evidence that the alleged sale was a bona fide "arm's length sale," and that it was "a sale for export to the United States" within the meaning of 19 U.S.C. 1401a.

13

from Team Energy to the factories specifically reference the United States of America as the destination for the garments, typically in two (2) or three (3) places on the purchase order. Although not dispositive, invoices from the factory to Team Energy are in United States dollars. The purchase orders and factory invoices also reflect Imperia's style numbers for the goods in question.

Customs has ruled that where purchase orders from middlemen to factories indicate the United States customers' style numbers, mention the customers by name (or trade number), and reference the United States as the final destination of the goods, this is evidence that the goods are clearly destined for export to the United States. See, e.g., *Customs Headquarters Ruling H137455, supra*. In addition, each of the factories have created garments in United States sizes, and have labeled them in English with labels required by United States law, such as the Textile Fiber Product Identification Act.

Customs has held that the placement of such markings and labels in garments, and the use of United States size designations in the garments, is persuasive evidence that the garments were sold "for exportation to the United States". See, e.g., *Customs Headquarters Rulings 545474 of August 25, 1995; Customs Headquarters Ruling 546871 of February 17, 1999; Customs Headquarters Ruling 546710 of March 2, 1999; Customs Headquarters Ruling 546657 of January 30, 1998; Customs Headquarters Ruling 545254 of November 22, 1994*.

### E.  There is No Evidence of "Non-Market Influences" Which Would Make the "First Sale" Prices Unacceptable as the Basis of Transaction Value

As discussed supra, in *Nissho-Iwai*, the Court indicated that "The manufacturer's price constitutes a viable transaction value when the goods are clearly destined for export to the United

States and when the manufacturer and the middleman deal with each other at arm's length, in the absence of any non-market influences that affect the legitimacy of the sales price". 982 F.3d at 509.  As noted above, all of the parties in this action are unrelated to each other, and Customs presumes that such parties act at "arms' length", i.e., according to normal market rules. See e.g., See, e.g., *Customs Headquarters Ruling H301049 of March 18, 2019*; *Customs Headquarters Ruling H295538 of May 31, 2018.* Because the parties are concededly not related to each other, the question of "non-market influences" was not explored in discovery by either of the parties.[11]

Quite recently, in *Meyer Corporation, U.S. v. United States*, Slip Op. 21-26 (March 1, 2021), one of the judges of this Court suggested (1) that an absence of "non-market influences" was a required showing where "first sale" appraisement is shown, and (2) that the burden of proving the absence of such influences rests with the plaintiff proposing the use of "first sale" appraisement.  That decision is of course not binding on this Court, and as discussed herein, plaintiff submits that it is both distinguishable on the fact (and most likely wrongly decided). However, plaintiff requested a short extension of time to submit the instant motion so that it could address the *Meyer* decision.

*Meyer* involved the appraisement of imported cookware in a three-tier transaction where all of the parties were "related", as defined in Section 402(g)(1) of the Tariff Act [19 U.S.C. §1401a(g)(1)].  The cookware in question was either made in China, or made in Thailand, using Chinese-made inputs provided by one of the related entities. The foreign manufacturers, middlemen, and the importer were all owned, directly or indirectly, by a British Virgin Islands holding company whose information was requested in discovery and refused.  Customs had

---

[11] If this Court determines that the issue of "non-market influences" is germane to resolution of this action, in which the parties are unrelated, plaintiff submits that the Court should stay the action and allow the parties the opportunity to take discovery of each other on this point.

appraised the goods on the basis of "transaction value" using the price in the related party sale to the importer of record. The importer sought to have the goods appraised on the basis of the related party "first sale", per *Nissho-Iwai,* from the manufacturers to the middleman.[12]  This court, per Aquilino, S.J., stated:

> The Nissho-Iwai "first sale" rule requires (1) bona fide sales that are (2) clearly destined for the United States, (3) transacted at arms' length, and (4) absent any distortive nonmarket influences.  Whether due to first sale tests being generally applied to transactions from market economy countries, the last consideration has generally been neglected, but it is not irrelevant in the contest of this case.

Slip Op. 21-26 at p.2-3.

Initially, the *Nissho-Iwai* court spoke of "nonmarket influences that affect the legitimacy of the sales price"; the *Meyer* court speaks of "transactions from non-market economy countries". It is not clear that the two courts are talking about the same thing.   The *Nissho-Iwai* court referenced situations "when the manufacturer and the middleman deal with each other at arm's length, in the absence of any non-market influences that affect the legitimacy of the sales price". Its focus was on the dealings between the manufacturer and the middleman, and the reference to the "legitimacy of the sales price" appears to address the question of whether the sales price is accurately stated.  It reflects the fact that related parties have the ability to manipulate prices in a way that could allow them to set a price which does not reflect free market principles.[13]

---

[12] Section 402(b)(2)(B) of the Tariff Act, as amended [19 U.S.C. §1401a(2)(B)] provides "The transaction value between a related buyer and seller is acceptable for the purposes of this subsection if an examination of the circumstances of the sale of the imported merchandise indicates that the relationship between such buyer and seller did not influence the price actually paid or payable;" or if it "closely approximates any of three statutory "test values". *See also* S. Rep. 96-249, 96th Cong., 1st Sess., at 21.

[13]  For related parties to set a skewed price between or among themselves is not itself unlawful, but for taxation purposes can result in improper tax avoidance or even evasion. Thus, taxing authorities generally have the power to reallocate costs and profits in sales between unrelated companies. See, e.g., 26 U.S.C. §482 (giving the IRS power to reallocate costs and profits, and impose taxes based on the reallocation). See also 26 U.S.C. §1059A (providing that in many related party transactions, an importer's taxable basis in goods may not be higher than the value declared to Customs for duty purposes).

On the other hand, the *Meyer* court took note of the fact that China is denominated a "Non-Market Economy" country for purposes of antidumping and countervailing duty proceedings, and suggested that "[one] method that could be used to establish the absence of PRC non-market influence are the factors used by entities located there to obtain a duty rate other than the country-wide rate established by the U.S. Department of Commerce in antidumping-duty proceedings involving non-market economy participants." Slip Op. 21-26, at 5.[14] *See also id.* at p. 110 (noting that one of plaintiff's witnesses "does not know if the local, regional, or national government of the PRC subsidizes the China Producer or any of the companies that provide the China producer with production materials").

Indeed, at one point, the Meyer court raised the question not only of whether "first sale" transaction value appraisement could be used with goods from non-market economy countries, stating that "costs are obviously critical to the [related party sale] determination, and the real costs of inputs from the PRC are suspect, given its status as a non-market economy country." *Id.* at 117. The Meyer court also asserted that "[e]ven if 'true' costs of such inputs could be determined, Meyer Holding presumptively has had the ability to influence the price paid or payable for them, for example by providing its subsidiaries access to credit and capital to terms that are not available to competitors without the same level of bargaining power with creditors, or even at 'below market' rates." *Id.* at 117-18.

---

Customs does not have authority to reallocate costs and profits in related party transactions for purposes of assessing Customs duties; it can only reject an unacceptable related party price, and look to a different basis of appraisement under 19 U.S.C. §1401a.

[14] This is clearly incorrect and illogical. That an NME respondent obtains demonstrates *de facto* and *de jure* independence from a foreign government in the context of an antidumping or countervailing duty proceeding does not mean that the party is free from the effects of dumping or subsidization, only that those effects, if any, will be measured differently than for "China wide" respondents.

Plaintiff respectfully submits that the Meyer court has improperly "crossed the streams"[15] and improperly imported the principles of the antidumping and countervailing duty laws into the Customs valuation statute – where they do not belong.

The Preamble to the GATT Customs Valuation Code refers to the other GATT Agreements in the course of "*Recognizing* that valuation procedures should not be used to combat dumping."[16] The GATT Valuation Code and the transaction value statute seek to create a *positive*, rather than *notional*, system of valuation, in which goods are valued, for Customs purposes according to *actual* prices, rather than idealized ones. By contrast, prior to 1979, the principal basis of Customs appraisement for goods imported into the United States was "export value", defined as follows:

> (b) Export Value. -- For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

See *F. B. Vandergrift & Co. v. United States*, 56 C.C.P.A. 105, 107 (1969). This was a notional basis of appraisement which sought to obtain an "ideal" value, and precluded resort to related party transactions.

Moreover, the concept of "Non-Market Economy" is irrelevant under the Valuation Code. Indeed, the Preamble to the Code contains a provision "*Recognizing* that customs value should be based on simple and equitable criteria consistent with commercial practices and that valuation

---

[15] See *Ghostbusters* (1984). "Crossing the streams" refers to allowing proton streams from multiple Particle Throwers to collide during use. Dr. Egon Spengler advises his colleagues that crossing the streams would be "bad". When his colleague Peter Venkman requests clarification of what "bad" means, Dr. Spengler says "imagine all life as you know it stopping instantaneously and every molecule in your body exploding at the speed of light". While crossing the streams in the legal context may not produce such calamitous results, it can quite possibly create bad law.

[16] See Sherman and Glashoff, *supra*, at p. 15.

procedures should be of general application **without distinction among sources of supply**." [Boldface emphasis added].  There are no distinctions in the statutory bases of appraisement based on the country from which goods are imported or that country's internal government or economic organization.

When trade distortions exist, the **WTO Antidumping Code** and **WTO Subsidies Code**, and those portions of the Tariff Act of 1930 implementing them, come into play. The remedies for distortive trade practices found in these statutes do not affect statutory tariff rates, or dutiable values, but rather impose special, additional, non-statutory tariffs for the purpose of offsetting the injurious effect of any identified trade distortion. Furthermore, these remedies may not be invoked to address every possible trade distortion. They may only be used when distorting trade practices exist and are quantified, and those practices are found to have caused injury to an industry in the country of importation. These types of trade distortions are not addressed using the WTO Valuation Code, and that Code has no mechanisms for identifying, quantifying or dealing with any such distortions which might exist. Customs applies the valuation statute every day to thousands of entries of goods which might be affected by "trade distortions"; the valuation laws simply don't care. And they don't contain a method to address them, or adjust for them. In this regard, plaintiffs submit, the *Meyer* case appears to have been wrongly decided, and this Court should disregard it in disposing of the instant case.

As noted above, Customs authorities who find a related party "transaction value" unacceptable cannot adjust that value; they can only reject it, and look to another statutory basis of appraisement. But those other bases of appraisement do not address trade distortions, either.

As noted above, first alternate basis of appraisement is the "transaction value of identical or similar merchandise" [19 U.S.C. §1401a(c)] in a sale to an unrelated purchaser. Assuming such

sales exist (they rarely do), a widget produced in China and sold to an unrelated purchaser potentially would have enjoyed the same subsidy as a widget sold to a related purchaser. This basis of appraisement allows adjustments for differences in the merchandise and in levels of trade, but not for "trade distortions".

Next in the hierarchy is "deductive value" [19 U.S.C. §1401a(d)], which is a "price minus" basis of appraisement. It begins with the price at which a good is generally sold to an unrelated purchaser in the United States, and then deducts certain non-dutiable costs, such as US selling expenses, international transportation costs and Customs duties. But if a "trade distortion" resulted in a price to the unrelated customer that is lower than it might otherwise have been, it will likely be reflected in the price to the unrelated customer. The allowable deductions won't adjust for it.

The next alternate basis of appraisement is "computed value" [19 U.S.C. §1401a(e)], which is based on the foreign producer's costs for materials, fabrication, plus an addition for general expenses and profit. The courts have stressed a preference for using the foreign producer's actual costs. If a producer's actual cost of, say, electricity, benefits from a subsidy, the computed value law provides no way to adjust for it.

Thus, to the extent the Meyer decision seeks to use the value laws to address the types of "market distortive influences" such as dumping or subsidization, the decision should be disregarded here.

While the court in *Meyer* was concerned with possible privately-generated distortions resulting from the undisclosed activity of the *Meyer* holding company, no related parties or holding companies exist in this case. Yet it might be noted that the Meyer court's treatment of the holding company concerns might provide a separate basis for that decision to be overturned on appeal. Many of the potential distortions which might have led to rejection of the "first sale" value, might

also have affected the "second sale" valuation and disqualified transaction value as a basis for appraisement entirely. But the Meyer court declined to examine the second sale, "for no party has proposed an alternative method of appraisement in any event. Slip Op. 21-26 at 119. However, the Court had an independent obligation, under *Jarvis Clark Inc. v. United States*, 733 F.2d 873 (Fed. Cir. 1984), to find the correct value, regardless of whether it was advanced by the parties. See e.g., *Peerless Clothing Int'l v. United States*, 33 C.I.T. 24, 28 (2009); *La Perla Fashions Inc. v. United States,* 22 C.I.T. 393, 395 (1998). Had this obligation been discharged, it might have resulted in rejection of transaction value altogether as the basis of appraisement in Meyer, in which case, that court's discussion of "first sale" would become largely moot[17]. This court should disregard the *Meyer* decision in deciding this case.

## IV.   CONCLUSION

For the reasons set forth herein, Plaintiff requests that this Court issue an order (i) granting Plaintiff's Motion for Summary Judgment; and (ii) determining that the subject goods in the protested entries should be liquidated according to the "first sale" prices at which they were sold from various Chinese factories to the Team Energy "for exportation to the United States", in accordance with the rule set out in *Nisso-Iwai American Corp. v. United States*, 982 F. 2d 505 (Fed. Cir. 1992).

---

[17] Alternatively, the court might determine that another basis of appraisement is appropriate if an importer did not wish to disclose its information. As noted in Sherman and Glashoff, supra:

> Nowhere, however, does it appear that the importer will be under an obligation to furnish any information. This last point is significant for various reasons. Most important, the importer should be permitted, if it chooses, to let Customs depart from [transaction value] if they believe they have grounds for doing so. Likewise, the importer should be permitted to disclose the information he regards as less sensitive from a commercial point of view without having to disclose that which is more sensitive. If that which he discloses does not persuade, he should once again be free to elect to take the consequences and go on to an alternative basis of valuation.

*Id. a*t p. 198, ¶ 611.

Respectfully submitted,

NEVILLE PETERSON LLP

/s/ John M. Peterson
    John M. Peterson
    Patrick B. Klein
    One Exchange Plaza
    55 Broadway, Suite 2602
    New York, NY 10006
    (212) 635-2730
    jpeterson@npwny.com

Dated:  March 15, 2021

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. MARK A. BARNETT, JUDGE**

```
------------------------------------------------------------------- X
IMPERIA TRADING, INC.,                      :
                                            :
            Plaintiff,                      :
                                            :
      v.                                    :        No. 15-cv-00142
                                            :
THE UNITED STATES,                          :
                                            :
            Defendant.                      :
------------------------------------------------------------------- X
```

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to the U.S. Court of International Trade Standard Chambers Procedures, and in reliance upon the word count feature of the word processing program used to prepare the instant Memorandum, I, John M. Peterson, of Neville Peterson LLP, who is responsible for the instant Memorandum, certify that it contains 7,225 words.

Respectfully submitted,
/s/ John M. Peterson
John M. Peterson